DEKLE, Justice
(dissenting).
Total disability terminates a laborer’s total livelihood, just as effectively for a “full-time” job as laborer pitching hay for livestock in his regular employment on the farm, as for pitching it at the livestock market in his part-time work. This is what has occurred here. The workman’s capacity to earn is ended in both jobs. The grocer and landlord make no distinction as to his source of income when it is insufficient to pay for his food and rent. Is he to be denied consideration being given to his total income which has been lost, because it is derived in two portions ? We deal with the “economic man,” says Alpert in his comprehensive work, “Florida Workmen’s Compensation Law,” § 11:13 (p. 352). The facts before us present a test as to whether the Court is going to give meaning to this fact of life.
Claimant was injured in his supplemental work at the livestock market which is admittedly covered under the Act. His work on the farm (agricultural) is of course not covered.[1] He asks no “coverage” for his farm work but only that his earnings on the farm be considered as a part of his loss of earning capacity for the week and be included for the purpose of arriving at his base for compensation, his “average weekly wage,” for the injury sustained in the pursuit which is covered. And so it is that this is not a matter of “modifying the law,” which I agree is the province of the Legislature for statutory changes; this is a matter of applying the law within the Act under this Court’s prior decisions on this precise point which are hereinafter set forth.
The same employer (under separate “sole proprietorships”) employs claimant both as laborer on his farm in Milton, Florida, and two days a week at his leased livestock outlet in nearby Jay, Florida, on Tuesdays and Wednesdays “and occasionally on Mondays.” The following facts were stipulated:
“The employer, Horace McCurdy, operates two independent businesses. Primarily he is a farmer in the Milton, Florida, area. His operations involve raising livestock and growing truck. After the establishment of his farming operations some years ago, Horace Mc-Curdy became the lessee of the Jay Livestock Market premises in 1964. These premises were leased to him by the State of Florida for operation as a livestock auctioning place and are located approximately 4 miles from the locus of his farming operations. Horace McCurdy’s farming operations and his operation of the Jay Livestock Market are both ‘sole proprietorships.’ In his capacity as the operator of a farm, McCurdy sold livestock through the Jay Livestock Market.
* * * * *
“Ellis Hill became associated with Horace McCurdy in March, 1966. For some time, Ellis Hill worked exclusively as one of Horace McCurdy’s farm employees. He was paid $25.00 per week and was given the use of a house and access to a ½ acre garden. The rental value of the house was $40.00 per month and the reasonable value of garden use was $20.00 per month. Ellis Hill worked approximately 40 hours per week on the farm.
“Subsequently, Hill was employed by Horace McCurdy to work at the Jay Livestock Market as a ‘yard man.’ He worked approximately 1 ½ days per week (Tuesday and Wednesday), and occasionally on Monday while livestock was moved from the farm to the market for sale on the following Tuesday. Hill would have worked additional hours at the livestock market had this work been available to him. Hill was frequently engaged in the feeding of livestock on *294 the farm, some of said livestock being held for subsequent sale in the livestock market. Hill was paid $10.00 for his work on Tuesdays and $5.00 for his ½-days’ work on Wednesdays.”
Claimant, along with other employees of this same employer under his “other hat” as a “farmer,” go down to the market on “sale days.” Claimant got up “at dawn” and “generally got through at noon” and was paid at the rate of $10.00 per day and $5.00 for “one-half days.” Even if compensation is based on the full $50.00 per week for all work for this employer at both locations, it is still only $30.00 per week as total partial disability. This is what the Judge found and what the Commission affirmed. Is this so “unfair”? The impact of disregarding related wages as a compensation base is mainly upon the laborer and low income groups who were most intended to be helped by the Act.
Consideration is certainly to be accorded the employer and carrier as to whether giving effect to a full weekly wage in similar employment as the basis for “average weekly wage” unfairly charges the insurance carrier which only covers the livestock market. The plight of the carrier is discussed in Barnes v. White’s Superette, Decision No. 2-909, cert. denied without opinion at 125 So.2d 875 (Fla.1960). There the claimant was “a butcher one day a week and a life insurance salesman the remainder.” The Commission, one member dissenting, ruled that the wages be combined to arrive at the average weekly wage, the base for compensation. The question of whether such combination base “was unfair to the insurance carrier because it received premiums based only on the wages paid as butcher” was considered. The Commission majority (approved on certiorari) held that “since the carrier was on the risk only one day a week, the premium was commensurate with the risk.” There is of course no exposure to coverage except for those days for which a premium is paid.
J. J. Murphy & Son, Inc. v. Gibbs, 137 So.2d 553 (Fla.1962), sets forth the meaning behind Workmen’s Compensation when it points out that the theory is to place the burden on “the specific segment of industry which caused the injury.” Measured by this fundamental, it is consistent that similar employment in the area of livestock here is so related to the farm from which that livestock comes that it would seem inseparable as far as being consistent with “that segment of industry” bearing the “burden.” Agriculture today is a related series of activities in its output of produce and livestock into the mainstream of industry. The facts here demonstrate this. It is therefore hardly fair to the workman to apply his earnings up to the farm gate, where the livestock are loaded into the cattle van bound for the livestock market for sale, as the only basis of compensation (not as a basis for coverage) and to exclude from the basis for compensation (average weekly wage) his supplemental earnings working with that livestock at the market. The fact alone that “agriculture” is excluded from coverage is not to say that it cannot be considered in circumstances like this as a similar employment to arrive at average weekly wage, where the underlying principle of the Act is to place the burden on “the specific segment of industry which caused the injury.” [2]
The carrier knows, or easily can know, what its exposure is and can even require continuing advices on it and arrange its premium accordingly. Claimant’s employment with the same employer under separate proprietorships was no secret here. In fact, it seems to have been within the control of the employer. He could as easily have ordered his employee (claimant) to the livestock market on whatever days or part of the week the employer’s business dictated. It is not a matter of being “unfair” to anyone in this situation, but one of *295 being fair to all. It is certainly fairer to have advance knowledge of the risk and arrange for it than it is to await the resulting hardship and then say, “Tough.” The “plight of the worker” must also be considered.
There are many instances, even where. the employers are different persons, when the “regular” employer must surely be aware that the amount he is paying each week is not a living wage and that his employee must obviously be taking other employment if he is to sustain himself and be available to work further for this employer. No one really hires a part of a man; he is a whole being. His arms and back cannot be employed without his stomach and general ■ well-being. There is, to be certain, part-time work but no “part” workman. The employee is sometimes compelled to seek other employment if he is to survive to continue to serve this employer. Accordingly, the employer is in a sense receiving the benefit of his employee having such other work and its income, in order to be an available employee. Here he is benefitting by having an employee skilled in the particular work, familiar with it and readily available whenever needed. Contractors are a typical example of those who try to keep their work forces intact. In slack times, they may even encourage their employees to take other employment until “that next contract” — when all can return to profitable work together. It is mutually beneficial.
The view here expressed is limited, as are the cited cases, to situations like that in the present circumstances where, as found by the Judge and confirmed by the Commission, the employments are similar. It makes sense. Where the employments are completely different, as in the authorities cited in the able majority opinion, I agree that the other dissimilar employment would not be included in fixing the average weekly wage as a basis for the rate of compensation. That is when the new legislation is needed as pointed out in White’s Superette, supra, and other cases cited, which make this clear distinction. One could hardly say that an independent contractor who is also in an entirely different business,[3] or one selling automobiles when his regular work was bridge tender [4] would be engaged in related employment which could reasonably be anticipated for workmen’s compensation purposes, and this Court has properly so held. They are different “segments of industry.”
The fact that the distinguishing feature in this problem turns on the similarity, or not, of employment is clearly demonstrated in the extensive opinion by our distinguished former colleague Justice O’Connell in J. J. Murphy & Son, Inc. v. Gibbs, supra. In the very thorough opinion on the point, numerous cases are cited, several of which are at the Commission level only, but all of which seem to point out this distinction and hold that the two employments, if similar, are to be combined to arrive at an average weekly wage as a basis for compensation.
It is a workman’s earning capacity which is on the line for the one day or whatever number of days that he is on that job. If the correct premium is charged for the one day or multiple days that his earning capacity is “on the line,” then coverage has been proper, and his lost capacity is then measured by what his average weekly wage was on all similar jobs that he was holding at the time. This point is made in Justice O’Connell’s opinion:
“In view of the fact that the benefits of the Act are designed to compensate *296 workers for loss of earning capacity it may well be that to refuse to allow combination of wages in ¿«similar employment will in some instances result in an inequity to a worker since his compensation may be based on wages which do not accurately reflect his actual earning capacity.
“While the Act is intended to be and is liberally construed in favor of the worker, nevertheless the drafters also, no doubt, considered the position of the employer and intended to be fair to him and his carrier. This no doubt accounts for the use by the legislature of words which we have held require that compensation be based on the wages earned by a claimant in the same type or kind of employment as that in which he was working at the time of his injury.
“If this was not the intention of the legislature it can readily correct our misinterpretation of the statute. It would be easy to change the statute to allow for combination of wages in ¿«similar employment.”[5] (emphasis added) (Apparently no legislative change is considered necessary for SIMILAR employment.)
The opinion in Murphy then concludes with the factual finding that the wages involved there came from two dissimilar employments and therefore could not be combined but it recognized the opposite result in the event of similar employments, as here.
Accordingly, I would deny certiorari, approving the Judge’s action, as the Industrial Relations Commission did, and would allow the petition for attorney’s fee here.
ERVIN, J., concurs.

. Fla.Stat. §,440.02(1) (c) 3 (1969), F.S.A.

. J. J. Murphy & Son, Ine. v. Gibbs, 137 So.2d 553 (Fla.1962).

. Wilson v. City of Haines City, 97 So.2d 208 (2d DCA Fla.1957).

. Jaquette Motor Co. v. Talley, 134 So.2d 238 (Fla.1961).

. J. J. Murphy & Son, Inc. v. Gibbs, supra.